IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.     No. CR 09-2476 MCA

**DESTRY NAYLOR,**

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Destry Naylor's *Motion to Suppress*, filed August 5, 2010. On October 5 and 6, 2010, and on February 22, 2011, the Court held evidentiary hearings on Defendant's motion. These hearings were consolidated with the evidentiary hearings on a suppression motion held in the case of United States vs. Nora Baca, 09cr2477, because the respective motions raised substantially the same factual issues. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearings, and otherwise being fully advised in the premises, the Court grants Defendant Naylor's *Motion* in part based upon the following findings of fact and conclusions of law. Defendant Baca's motion is addressed in a separate opinion.

## I. FINDINGS OF FACT

1.  On July 15, 2009, six members of the Bernalillo County Sheriff's Office (BCSO) congregated near 1413 El Oriente, SW in order to execute three arrest warrants for Kevin Pressley. [Doc 49 at 9-10, 47]

2.  On June 5, 2009 and July 4, 2009, BCSO made undercover purchases of narcotics from Pressley at the 1413 El Oriente residence. [Id. at 43]

3.  Detective Jamal Jackson secured a search warrant for the 1413 El Orient residence on July 7, 2009. [Id. at 8-9, 43]

4.  Detective Jackson proceeded with caution in executing the warrant because 1413 El Oriente had been the subject of an Albuquerque Police Department raid in June 2008 and a methamphetamine laboratory was discovered at the residence at that time. [Id. at 11-13]

5.  The BCSO team arrived at 1413 El Oriente at approximate 5:00 p.m. on July 15, 2009. [Id. at 13]

6.  Detective Jackson did not immediately approach the house and serve the warrant because there was potentially a methamphetamine laboratory inside. [Id. at 13-14]

7.  The residence had a "For Sale" sign in the yard. [Id. at 48]

8.  Defendant arrived at the residence in his pick up truck, and as Defendant got out of the vehicle, Pressley came out of the residence to greet him. [Id. at 14-15]

9.  Defendant locked his truck. [Id. at 237]

10. Pressley was identified by the BCSO team as the subject of the warrant. [Id. at 17]

11. Both men went back inside the residence. [Id. at 15]

12. Soon after, Nora Baca drove a recent model BMW up the street and parked near 1413 El Oriente. [Id. at 15-16]

13. Pressley and Defendant came out of the house and spoke with Baca in the front yard

of the residence. [Id. at 17]

14. Detective Louiz Funes, a plain-clothes member of the BCSO team, approached the residence and asked questions about whether the house was for sale. [Id. at 170-71]

15. Detective Funes then gave the signal for the other law enforcement agents to move in; he pulled out his gun and his badge. [Id. at 171, 176-77]

16. On receiving the signal, the rest of the team arrived in the yard. [Id. at 177]

17. When Defendant saw the BCSO team coming toward the yard, he intentionally dropped his truck keys in a flower bed. [Id. at 233-34]

18. Detective Jackson, Detective Funes, and Sergeant Shureke Covington remained in the yard with Pressley, Defendant, and Baca. [Id. at 17-30, 178, 108]

19. Detective Robert Bolin, Detective Joaquin Rodriguez, and Detective Michael Fisher proceeded inside the residence in order to secure and search the premises. [Id. at 164, 191, 202]

20. Having conducted a site visit, the Court finds that the yard is very narrow, at approximately 12 feet deep by 40 feet long.

21. Detective Jackson first approached Pressley, introduced himself, and presented the warrants. [Id. at 17]

22. Although it is unclear whether Defendant and Baca were handcuffed at this time, the Court finds that they were being supervised by police officers and were not free to leave.

23. Pressley was arrested and Detective Jackson read him his rights. [Id. at 18-19]

24. Detective Jackson searched Pressley and located a quantity of methamphetamine, divided into different amounts and secured in small plastic ziploc baggies, as well as a clear glass pipe. [Id. at 19-20, 22]

25. Pressley was placed in a police vehicle. [Id. at 25]

26. Detective Jackson approached Defendant, introduced himself, and read Defendant his rights. [Id.]

27. Sergeant Covington witnessed Detective Jackson reading Defendant his rights. [Id. at 109]

28. Detectives Fisher testified that he did not hear Detective Jackson advise Defendant of his rights; however, Detective Fisher was assigned to clear the residence and his focus was elsewhere about the house. [Id. at 206, 211]

29. Detective Bolin testified that he did not hear Detective Jackson advise Defendant of his rights, but Detective Bolin was also assigned to secure the house. [Id. at 164, 167]

30. Defendant was frisked and an expandable baton was discovered in Defendant's back pocket. [Id. at 25]

31. An expandable baton is an "impact tool," commonly used for hitting people. [Id. at 26]

32. Detective Jackson testified that he began to move away from Defendant and noticed a brown leather cell phone case on the ground near Defendant's left foot. [Id. at 101-02] He asked Defendant if the cell phone case belonged to him and the Detective testified that Defendant acknowledged that the case belonged to him.

33. Detective Jackson testified that he picked up the case and then noticed a small baggie protruding from the case which contained a crystal like substance. He testified that field tests were conducted and the baggie was determined to contain a quantity of methamphetamine. [Id. at 28-29]

34. No other officer testified about conducting or observing field tests on the contents of a baggie belonging to or related to Defendant.

35. Detective Funes, who was present in the yard, testified that he did not remember seeing or hearing about a leather cell phone case. [Id. at 181]

36. Detective Jackson testified that the cell phone, the case, and the baggie were placed in Defendant's truck. [Id. at 63-63]

37. The cell phone and the cell phone case were not tagged as evidence or photographed and have not been located since the encounter. [Id. at 63-64]

38. Detective Jackson testified that the baggie with the methamphetamine (which he testified was taken from the cell phone case) was taken to the South Valley Command Center, the contents were dumped to another container and sealed. [Id. at 105-06] This separate sealed container was not produced at the hearings.

39. Defendant testified that he was carrying a cell phone, but that it was not in a leather case and that it was located in his front right pocket. [Id. at 235-36]

40. Defendant testified that he was not questioned about a leather pouch. [Id. at 236]

41. Defendant further testified that he had methamphetamine in his vehicle, but that he did not purchase any methamphetamine from Pressley. [Id.]

42. The Court finds that Detective Jackson's testimony with regard to observing and locating the leather cell phone case and the methamphetamine baggie contained therein is not credible because the cell phone, the case, and the baggie of methamphetamine were not tagged as evidence, logged on an inventory, photographed, or produced in court.

43. After speaking with Baca and looking inside her BMW, Detective Jackson left the scene to draft search warrant requests for the truck and the BMW. [Id. at 38]

44. Between encountering Defendant at the residence and drafting the warrant affidavit, Detective Jackson was made aware that Defendant had a criminal history, including trafficking in controlled substances. [Id. at 99]

45. Review of the warrant affidavit demonstrates that the basis for the warrant to search the truck was the report that Detective Jackson discovered methamphetamine in a leather cell phone case and that Defendant claimed the case as his, as well as his criminal history. [See Naylor 1]

46. Detective Jackson returned with the search warrants, signed by a judge, at 9:45 p.m. [Id. at 38, 68]

47. Detective Jackson was absent from the scene from approximately 7:45 p.m. until 9:45 p.m., or approximately two hours. [Id. at 68]

48. No member of the BCSO team testified that they opened the doors to the truck to initiate the search. [See id. at 39 (Jackson), 114-115 (Covington), 166 (Bolin), 182-83 (Funes); 193 (Rodriguez), 208 (Fisher)]

49. When asked whether it was light out or dark when the truck was searched, only Detective Bolin remembered that it was dark; the remaining detectives could not recall. [Id. 116 (Covington), 166 (Bolin), 183 (Funes), 193 (Rodriguez), 208 (Fisher)

50. Detective Rodriguez, the photographer, testified that he couldn't recall if the truck was searched or who searched it, but he "would have" photographed the truck prior to any search, as well as any items of value located inside. [Id. at 193]

51. No photographs of the truck or the evidence located inside were produced by the Government at the hearing.

52. Defendant produced a photograph of his truck, showing that the door was damaged due to forced entry. [Naylor 5]

53. Detective Jackson testified that the truck was not searched until he returned to the scene with the warrants at 9:45 p.m. [Id. at 38-39, 68]

54. Defendant and Pressley testified that the truck was searched in the daylight, before the warrants arrived. [Id. at 141 (Pressley), 242 (Defendant)]

55. On direct examination, Detective Jackson testified that he participated in the search of the truck, but on cross examination, Detective Jackson testified that he did not search the truck, only the BMW. [Id. at 39, 66, 72]

56. Detective Chris Romero, also with the BCSO, was also present during the events of July 15, 2009 at 1413 El Oriente. [Doc 61 at 75]

57. He testified that when he left the scene, between 7:00 p.m. and 7:30 p.m., it was dark, the doors to the truck were open, and the truck was being searched. [Id. at 81]

58.  Detective Romero also testified that he did not see who opened the doors to the truck or how entry was made. [Id. at 83]

59.  Agent Tom Bartusiak, with the Drug Enforcement Agency, arrived at 1413 El Oriente on July 15, 2009 sometime after 7:00 p.m. and it was just getting dark. [Id. at 87]

60.  Agent Bartusiak testified that he left with Detective Romero between 7:30 p.m. and 8:00 p.m. and that at that time, the truck was not being searched. [Id. at 98-100]

61.  The Court finds that all BCSO officers' hearing testimony with regard to searching the truck is not credible for the following reasons: (1) the Government did not produce a single police officer who was present on the scene who admitted to opening the truck at any time, even though the truck was clearly opened and searched; (2) there was no consistent testimony about the time that the truck was searched; and (3) Detective Jackson was admittedly absent from the scene, obtaining warrants, and he additionally provided conflicting testimony about whether he participated in searching the truck.

62.  The Court further finds that the BCSO officers' collective testimony about when the pickup was opened undermines Detective Jackson's earlier testimony suggesting that the cell phone, phone and baggie were placed in the truck at a time prior to the execution of the search warrant.

63.  Defendant was indicted on August 27, 2009 for one count of possession of a controlled substance with intent to distribute, contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(B), and one count of carrying a firearm during and in relation to a drug

trafficking crime, contrary to 18 U.S.C. § 924(c)(1)(A).  [Doc 4]

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant makes three arguments in support of suppression.  He first argues that the initial detention was not valid because the warrant to search Pressley's home was stale.  Next, he contends that the search of the truck was not conducted pursuant to a valid warrant.  Finally, he argues that he was not advised of his Fifth Amendment rights and so any statements that were elicited must be suppressed.  As an initial matter, at the suppression hearings, a question arose as to whether the Government properly disclosed certain evidence.  The Court begins with the disclosure issue.

### A.     Rule 16—Discovery Violation

At the October 6, 2010 hearing, the second day of the suppression hearing, the Government informed Defendant that it had become aware of post-arrest statements, allegedly made by Baca.  [Doc 50 at 13-16]  As a result, the Government announced that it intended to call rebuttal witnesses, who could testify about the post-arrest statements, in order to discredit some statements made by Defendant and Pressley.  [Id. at 14]  Defendant moved the Court, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, to "[s]trike any testimony from any purported statement of any Defendant that hasn't been disclosed."  [Id. at 22]

Rule 16(a)(1)(A) states that "[u]pon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a

9

government agent if the government intends to use the statement at trial." The Rule continues to establish a continuing obligation of disclosure: "A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if . . . the evidence or material is subject to discovery or inspection under this rule. . . ." Rule 16(c)(1). Our Circuit has explained that

> [w]hen it comes to the district court's attention that the government has failed to comply with Fed.R.Crim.P. 16, 'the court may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.'

United States v. Ivy, 83 F.3d 1266, 1280 (10th Cir. 1996) (alterations in original) (quoting Fed. R. Crim. P. 16(d)(2)).

At the October 6, 2010 hearing, after hearing from the parties, the Government represented that it would track down the alleged post-arrest statements and the agents or officers who took the statements. [Doc 50 at 33-25] The Court took the matter under advisement and reconvened on February 22, 2011. [Id. at 42; Doc 61] On that date, the Government produced two witnesses, Agent Tom Bartusiak and Detective Chris Romero, to testify regarding the alleged post-arrest statements. Defendant and Baca then renewed their objections under Rule 16. [Id. at 4-9] Further, Defendant and Baca represented that they never received any further information from the Government regarding the content of the statements or any reports by the agent or officer who took the statement. [Id.] The Government responded that it gave them all the information that it had: on October 5, 2010, prior to the second day of the suppression hearing, the Government emailed Baca's counsel

10

a summary of the statement purportedly made by Baca, as recounted from the memory of the officer who took the statement. [Id. at 8]

The Court finds that the Government provided Defendant with the contents of the post-arrest statement when it learned that a post-arrest statement had been made and that the Government acted in good faith to make the required disclosures. Further, given the breadth of this Court's discretion to impose a remedy under Rule 16(d)(2), even if the Court found that the Government failed to comply with Rule 16, Defendant had ample time to review the contents of the statement, as read into the record on October 6, 2010 [Doc 50 at 29], in order to prepare for the next hearing or a future trial. Accordingly, the Court denies Defendant's motion to strike the testimony of Agent Bartusiak and Detective Romero for failure to disclose.

## **B.**    **Detention**

Defendant next challenges the warrant authorizing the BCSO team to search Pressley's house, contending that it was issued on July 7, 2009, that it required execution "forthwith," and that it was not executed until July 15, 2009. [Doc 37 at 4] Defendant, however, does not have standing to challenge the warrant to search Pressley's home. Fourth Amendment rights are personal and, therefore, "a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." United States v. Erwin, 875 F.2d 268, 270 (10th Cir.1989). Consequently, a threshold issue is whether the search at issue violated the rights of the particular defendant who seeks to exclude the evidence. This inquiry has evolved into a

two-part test wherein the Court must determine whether (1) the defendant has exhibited a subjective expectation of privacy in the area searched, and (2) society is willing to recognize that expectation as being objectively reasonable.  Soto, 988 F.2d at 1552.

Assuming the invalidity of the warrant, Defendant has not demonstrated (1) a subjective expectation of privacy in Pressley's home that (2) society would recognize as objectively reasonable.  According to Defendant, he was at Pressley's home as a potential buyer,[1] and he asserts no facts that could support the finding of a privacy interest in that property.  [See Doc. 37 at 4 (Naylor) ("[O]n July 15, 2009 [Defendant] was exploring the possibility of purchasing Mr. Pressley's house.")].  He does not, for example, contend that he was an overnight guest.  See United States v. Poe, 556 F.3d 1113, 1122 (10th Cir. 2009) ("[A] simple overnight guest has Fourth Amendment standing.").  Nor does he claim that he was a social guest not staying overnight.  See United States v. Rhiger, 315 F.3d 1283, 1286 (10th Cir. 2003).  Instead, Defendant testified that was present at Pressley's home for the purely commercial reason of "exploring the possibility of purchasing Mr. Pressley's house." [Doc. 37 at 4].  As such, he cannot claim an expectation of privacy such that he might now argue that any search of the Pressley home violated Defendant's Fourth Amendment rights.  See Minnesota v. Carter, 525 U.S. 83, 90-91 (1998) (search of lessee's apartment did not violate Fourth Amendment rights of visitors who (1) were present in apartment for "relatively short period of time;" (2) were in apartment for "purely commercial" purpose of conducting drug transaction; and (3) lack of any previous connection to lessee).

**C.    Search**

---

[1] This assumption does not imply that the Court accepts as true Defendant's representation that he was at the house as a prospective buyer.  The Government provided evidence to the contrary, that Defendant accompanied Baca to the house while she attempted to collect money owed to her by Pressley.  [Doc 61 at 77-78; 93-95]

Turning to the search of the truck, Defendant argues that he did not give consent for the BCSO team to search his truck and that it was searched prior to the issuance of a valid search warrant. [April 27, 2011oc 37 at 5, 6] The Government does not suggest that Defendant consented to the search of the truck, in fact, Detective Jackson testified that he did not ask for consent to search Defendant's truck. [Doc 49 at 65] Instead, the Government argues that the truck was not searched until Detective Jackson returned with a valid warrant. [Doc 46 at 7]

> The Fourth Amendment to the United States Constitution provides that
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. After listening to the testimony and evaluating the evidence presented at the suppression hearings, this Court has determined that the truck was searched prior to the issuance of the warrant. The Government produced no evidence regarding when the truck was opened or by whom. Seven police officers and one federal agent testified regarding the events of July 15, 2009. They were present at the premises. Each officer testified that he did not open the truck, and each officer either provided conflicting testimony about the time the truck was entered or had no memory of the event. It is clear that the truck was searched, but the Government has not established when or by whom.

Additionally, the only officer to testify that the truck was not opened until 9:45 p.m.[2], was Detective Jackson, who provided inconsistent testimony about his involvement with the search of the truck. In direct examination, Detective Jackson was asked: "When you executed the warrant on Mr. Naylor's truck, what—what took place?" [Doc 49 at 39] Detective Jackson answered: "The—the vehicle itself was opened and the search of the vehicle produced a couple different items." [Id.] The exchange continued:

> Question: Before we get to those items, how was the vehicle opened?
> Answer: You know, I don't remember how the vehicle was—was opened.
> Question: Okay. But you—did—did Mr. Naylor have his keys on him?
> Answer: At this point I don't—I don't think Mr. Naylor had anything on his person.
> Question: Oh, 'cause you had taken custody of him.
> Answer: Right.
> Question: Right. Okay. So you got into the—to the truck, and what did you find?

[Id.] Detective Jackson then detailed what he found in the truck. [Id. at 39-40] He was then asked "Okay. Anything else in the truck?" and he answered "Not that I can recall." [Id. at 40] The prosecutor asked "Did you—what did you do next?" and Detective Jackson answered, "Moving on from that vehicle, I moved over to Miss Baca's vehicle." [Id. at 40-41]

On cross examination, Defendant's counsel asked "did you participate in the

---

[2]Sergeant Covington testified that he looked into the truck "after the vehicle had been opened pursuant to a search warrant," but he did not remember the time of day, whether it was dark or light, or how the truck was opened. [Doc 49 at 116] Nor does this testimony establish that the truck was not opened prior to the search warrant—only that Sergeant Covington did not look into the truck until the warrant arrived.

execution of the truck after you got the search warrant?" and Detective Jackson answered "I did not." [Id. at 66]  Later, counsel queried "what were you doing if you weren't assisting in the execution of the Dodge truck owned by Mr. Naylor?" [Id. at 72]  Detective Jackson answered as follows:

> I returned back the search warrant and basically provided the search warrants done to the supervisors, saying, 'Here they are. You can go ahead and commence executing the search warrants on these two vehicles.' And basically I went over to Miss Nora's—Miss Nora Baca's vehicle and executed the search warrant on that vehicle.

[Id. at 72] The Court does not credit Detective Jackson's statement that the truck was not searched until 9:45 p.m., when he returned with the warrant, because his testimony regarding the search of the truck was inconsistent.

No officer testified to opening the truck, and the truck was clearly opened.  Detective Jackson was absent for two hours while he obtained the search warrant, and cannot testify as to what occurred in his absence.  The Government provided no other evidence to factually demonstrate that the officers waited to search the truck until the warrant arrived. Accordingly, the Government has not met its burden to demonstrate that the search was conducted pursuant to a valid warrant and reasonable under the Fourth Amendment.  See United States v. Turner, 553 F.3d 1337, 1344 (10th Cir. 2009) ("The government carries the burden of demonstrating reasonableness.").

Even where the search was conducted without a warrant, as I conclude was done here, "[t]he inevitable discovery doctrine provides an exception to the exclusionary rule . . . and permits evidence to be admitted if an independent, lawful police investigation inevitably

15

would have discovered it." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005) (internal quotation marks and citations omitted). This inevitable discovery doctrine may apply where, "in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000). It is the Government's burden to prove, by a preponderance of the evidence "that the evidence at issue would have been discovered without the Fourth Amendment violation." Cunningham, 413 F.3d at 1203.

The Court considers four factors in evaluating the inevitability of discovery of evidence found during a warrantless search:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

Souza, 223 F.3d at 1204 (internal quotation marks and citation omitted). The first and the third factors are "entitled to great importance in determining whether the evidence would have inevitably been discovered pursuant to a warrant." Id.

In the present case, it is undisputed that Detective Jackson left to draft an affidavit and to obtain a warrant and that a warrant was ultimately issued. The sticking point, however, is the second factor, probable cause. The affidavit for the search warrant set forth Detective Jackson's knowledge of Defendant's criminal involvement with methamphetamine, as well as the fact that methamphetamine was found in a leather cell phone case and that Defendant

claimed the cell phone case as his. [Naylor 1] The affidavit further sets forth that a weapon, an expandable baton, was found on Defendant's person, although Defendant had claimed that he was not armed. [Id.] In addition, it was apparent that Defendant was observed at a residence known to house a person engaged in dealing drugs—Pressley. [Id.]

The Court finds Detective Jackson's testimony regarding the discovery of the leather cell phone case with the methamphetamine is not credible. The cell phone, the case, and the baggie of methamphetamine were not tagged as evidence or produced at the hearing. Two other officers testified that they were outside with Detective Jackson and Baca in an extremely small front yard. Although Detective Jackson testified that the substance in the baggie was tested to determine what it was, neither of the other officers corroborated the discovery nor testing of the baggie of methamphetamine. Defendant acknowledged that he had a quantity of methamphetamine in his truck but denied having any on his person. The Court further questions Detective Jackson's credibility because he testified that he discovered a used syringe in Baca's purse—a syringe that was not tagged as evidence, not produced in court, and never seen again after its discovery. [Id. at 30, 87-89]

Evaluating the facts known to the officers and absent the discovery of the methamphetamine in the cell phone case, they lacked probable cause to search the truck without a warrant. It was known (1) that Defendant was present at a drug dealer's house, (2) that Defendant had previous drug arrests, and (3) that Defendant had on his person an expandable baton. These facts do not, under the totality of the circumstances, lead to probable cause that there was evidence of criminal activity to be discovered in the truck. See

id.

Our Circuit permits the evidence of an unlawful search to be admitted "if an independent, *lawful* police investigation inevitably would have discovered it." Cunningham, 413 F.3d at 1203 (emphasis added). In the present case, the Court does not credit Detective Jackson's testimony regarding the existence of the leather cell phone case and the small baggie of methamphetamine (purportedly located on the ground) that was attributed to Defendant. Accordingly, despite the ongoing, and ultimately successful, warrant procedure, the searching officers lacked probable cause to search the truck before the warrant arrived.

### D.     Statements

Finally, Defendant argues that any statements he made must be suppressed because he was not advised of his Fifth Amendment rights. [Doc 37 at 7] It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. 436, 444 (1966). Those procedural safeguards are such that "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.

Despite Defendant's arguments to the contrary, Detective Jackson testified credibly that he provided Defendant with Miranda warnings at the outset of their encounter. Sergeant Covington also testified that he heard the Detective Jackson provide Miranda warnings. Although Detectives Fisher and Bolin testified that they did not hear Detective Jackson read Defendant Miranda warnings, both officers also testified that they were assigned to secure and clear the residence and

that they were not focused on the events occurring outside in the yard.  Because the Government provided credible evidence that Defendant received the benefit of the Miranda safeguards, the Court denies his *Motion* in this respect.

### III.    CONCLUSION

For the foregoing reasons, Defendant's *Motion to Suppress* is **GRANTED** to the extent that the contents of Defendant's truck must be suppressed.  The *Motion*, however, is **DENIED** to the extent that Defendant received the necessary Miranda warnings and accordingly, any statements made by Defendant are admissible.

**IT IS, THEREFORE, HEREBY ORDERED** that Defendant's *Motion To Suppress* [Doc 37] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED** this 10th day of May, 2011, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge